GEORGE WASHINGTON, SR., PETITIONER, *v.* COMMISSIONER OF
INTERNAL REVENUE, RESPONDENT.

Docket No. 83712.    Promulgated June 11, 1937.

*Allen G. Gartner, Esq.*, for the petitioner.
*O. W. Swecker, Esq.*, for the respondent.

76

OPINION.

MURDOCK: The statute of limitations has run against the assessment and collection of any deficiency for 1930 unless the petitioner's return for that year was false or fraudulent with intent to evade tax. Sec. 276 (a), Revenue Act of 1928. The Commissioner contends that

the petitioner's return for that year was false or fraudulent with intent to evade tax as is shown by the fact that the petitioner failed to report as a part of his income on that return the dividends paid on 1,125 shares of the common stock of the company standing in the name of his wife. The Commissioner also claims that a part of the deficiency for each year is due to fraud with intent to evade tax. Fraud is shown, he says, by the petitioner's failure to report as a part of his income the dividends paid in each year on the 1,125 shares of the common stock of the company which stood in the name of the petitioner's wife, and by the petitioner's failure to report the dividends on the 6,000 shares which were in the names of his wife and daughter and later in the name of the trust. The burden of proof on these issues is by statute placed upon the Commissioner. Sec. 907 (a), Revenue Act of 1924, as amended by sec. 601, Revenue Act of 1928.

The point which the Commissioner attempts to make is that each of the alleged gifts lacks two of the essential elements of a bona fide gift, to wit, first, a clear and unmistakable intention on the part of the donor to absolutely and irrevocably divest himself of the title, dominion, and control of the shares, and, second, an irrevocable transfer of the present legal title, the dominion, and the control of the entire gift to the donee, so that the donor can exercise no further act of dominion or control over it. These elements are essential to a valid gift *inter vivos*. *Adolph Weil*, 31 B. T. A. 899. There is no contention that other essential elements of a valid gift are lacking.

The Commissioner argues that the petitioner did not intend to make gifts, but intended only to reduce his income taxes by divesting himself of the naked legal title to the stock, retaining all beneficial interest in the stock. Obviously this argument would not apply to the 1,125 shares which the petitioner gave to his wife in 1910 before there was any income tax law. The Commissioner also contends that there is some connection between the later transfers to the petitioner's wife and daughter, and the sale by the petitioner in January 1929 of his secret process to the company for $1,500,000 and 8,134 shares of the common stock of the company. He states that in November 1929 the petitioner canceled all future payments under the sale because he realized that the cash payments to be received during each of the six years following would result in large income taxes; after he canceled the payments, the company, for the first time, began to pay large dividends; and the petitioner then realized the desirability of splitting up his stockholdings among the members of his family to reduce his income taxes. The Commissioner also contends that the petitioner benefited from the dividends on the stock through the payment by his wife of premiums on life insurance policies taken out upon the life of the petitioner (citing

*Burnet* v. *Wells*, 289 U. S. 670) and through payment by the trust of the expenses of Franklin Farms (citing *Hill* v. *Commissioner*, 88 Fed. (2d) 941, affirming 33 B. T. A. 891).

The story of the petitioner, of his early failures, of his persistence, of his faith in and his reliance upon others, and of his ultimate financial success is unusual and extremely interesting. He is a chemist and an inventor. He came to this country in 1896, bringing with him his wife and his daughter Louise. Two additional children were born while the family resided in New York. Following a business disappointment, he decided to move his family to Guatemala. He operated a plantation there with the aid of his wife. In Guatemala he conceived the idea of reducing coffee to a concentrated soluble form. The laboratory which he set up for his experiments was destroyed in 1906 by an earthquake. The petitioner then returned to New York to make use of better laboratory facilities there. His wife and the three children remained in Guatemala and she continued to operate the plantation. The petitioner was supported during this period by money which his wife provided. Part of this was her own, the remainder she earned from the operation of the plantation. The petitioner finally perfected his process, which he determined to keep a secret between himself and his wife. His family joined him in New York, where he and his wife started to manufacture the product under the secret process. Lina assisted her husband in many ways. When the company was organized the petitioner gave her one-half of the shares which he received, except for one share which was placed in the name of a director in order to qualify him. Thereafter the petitioner never received any dividends on these shares and never had physical possession of the certificate. The first dividends were paid in 1929. Sometimes Lina voted her shares individually at stockholders' meetings; sometimes she voluntarily gave proxies to her husband and others when such proxies were requested, and once, to satisfy the objection of the preferred stockholders that the inventor controlled the company, she endorsed her certificate for voting purposes to trustees. Later, she again held a certificate or certificates for her shares. New certificates were issued to her at various times as a result of corporate changes. Clarence Mark became vice president of the company and a trusted and valued friend and advisor of the petitioner and his wife. At Mark's request, and in order to retain his services and keep him satisfied, the petitioner and Lina in 1929 sold to Mark one-fourth of their common stock in the company at a very low price. Thereafter, Lina owned and continuously held certificates for 1,125 shares. During the latter part of 1931 the petitioner gave an additional 3,000 shares of the common stock of the company to his wife and also gave 3,000 shares of the same stock during that period to Louise.

These gifts were made without any reservations whatsoever. There was no understanding between the donor and donees in regard to the use of the shares or the dividends from the shares. The petitioner intended to part with the shares. They were complete bona fide gifts.

The respondent contends that the petitioner was extremely tax conscious, as shown by various transfers and retransfers of property between the petitioner and his children in prior years. It does not appear, however, that those transfers were made merely to reduce income tax. The Commissioner also argues that the use to which the dividends from the stock were put shows that the petitioner did not intend to and did not divest himself of title, dominion, and control over the shares. In this connection he points to the fact that Lina paid premiums on five policies of life insurance upon the petitioner's life. These policies had been taken out originally by the company for its protection and it had paid the premiums. About 1927 the company sold the policies to members of the petitioner's family. Later, but prior to the taxable years, the policies were placed in a trust established by the petitioner. The trustee was named beneficiary of the policies. Lina and Louise were given life estates in the income from the investment of the proceeds of the policies. The other children and some relatives of the petitioner were likewise beneficiaries under the trust. The petitioner had power to alter, modify, or revoke the trust during his lifetime, but he could not cash the policies, borrow on them, or draw the dividends on them except in payment of premiums. The record is not entirely clear as to who really owned these policies and who had the right to change beneficiaries, but that circumstance may be relatively unimportant here, and it may be assumed that the petitioner was the owner and had the right to change the beneficiaries. Lina paid premiums on the policies amounting to $11,054.25 in 1930 and $18,599.25 in each of the other years. Although the record does not show just why she made the payments, it is clear that she was not required to make them. She paid them voluntarily. The dividends on her stock in the company were for some years less than the premiums which she paid, while in other years they were in excess of the premiums. The fact that the petitioner failed to report in his income the amount of the premiums which his wife paid, does not show any fraud upon his part. Since the wife paid those premiums voluntarily from her own income, and since the premiums were not paid from the income of any trust (cf. sec. 167, Revenue Act of 1928; *Burnet* v. *Wells*, 296 U. S. 670) established by the petitioner, there is no good reason whatsoever to include the amount of the premiums in the petitioner's income for any of the years.

The petitioner relied upon Mark and others to handle many of his business and personal financial transactions. Although he made a great deal of money out of his secret process, yet his tastes remained simple and he made but modest use of his fortune for living and personal expenses. He was fond of his family and desired that his wife and children should be supplied with whatever they might want. His wife and Louise, his daughter, wanted to continue to live upon the large estate known as Franklin Farms. The house contained about forty-two rooms. Lina managed the house. Louise managed a dairy farm on the estate. The petitioner's two younger children were married and did not live at Franklin Farms in the latter part of 1931. The petitioner thought that the expense of maintaining the place was entirely too large under the circumstances. He suggested that they dispose of it and move to a smaller place. But Lina and Louise said they liked it so much that they wanted to live there always and have it as their permanent home. They, as a result of the petitioner's generosity, had some independent means, and they offered to share the expense of the estate with the petitioner. Louise was a mature woman at that time. The three shared the expenses of the estate equally during the first six months of 1932. The fact that Lina and Louise voluntarily paid from their own incomes a part of the expenses of Franklin Farms for the first six months of 1932, coupled with the further fact that the petitioner did not report in his income any part of the expenses thus paid by his wife and daughter, falls far short of proving that a part of the deficiency for that year was due to fraud with intent to evade tax. A similar statement may be made about the situation which existed after the trust was created in June 1932. If the petitioner had created a trust solely with his own property for the purpose of paying the expenses of Franklin Farms, the case of *Hill* v. *Commissioner*, cited by the respondent, would be authority for holding that the petitioner could not thereby escape tax on the income from the property actually used to pay expenses of the estate. It would not, however, be authority to support the Commissioner on the fraud issue. Furthermore, the present case is distinguishable on its facts from that case. Here the petitioner did not create the trust out of his own property. He was one of three who created the trust. The income-producing property held by the trust was contributed equally by the three grantors. The wife and daughter made their contributions voluntarily. The petitioner did not escape tax through this device. He was taxable upon one-third of the income of the trust just as previously he had been taxable upon the income of one-third of the income-producing property. Excess income was divided and the petitioner was certainly not taxable with all of it. *Hill* v. *Com-*

*missioner, supra,* would seem to be authority for requiring Lina and Louise, likewise grantors, to report their respective shares of the income of the trust, since that income was either distributed to them directly or was used as they directed and desired for their own benefit. There was no provision of this trust, nor was there any agreement, that any of the income of the trust should be used to pay premiums on life insurance covering the life of the petitioner. Cf. *Burnet* v. *Wells, supra.* It is immaterial that Lina may have used some of the income from the trust to pay a part of the premiums. Cf. *Commissioner* v. *Mott,* 85 Fed. (2d) 315, where the court said: "The premiums were not, however, paid from income of the trust estates but were paid by the beneficiaries of the policies, who had income in addition to their income derived from the trust estates." The facts in the present case show that Lina must have paid the larger part of these premiums for 1932 and 1933 from funds other than those which she derived from the trust.

The evidence as a whole not only fails to show that the return for 1930 was false or fraudulent with intent to evade tax and that a part of the deficiency for each year was due to fraud with intent to evade tax by reason of the petitioner's failure to report dividends on the stock in question, but, on the contrary, it shows that the petitioner made bona fide gifts of the shares to his wife and to his daughter, and the dividends belonged, not to him, but to his wife, his daughter, and the trust.

Reviewed by the Board.

*Decision will be entered for the petitioner.*